Case number 23-2249 from North Dakota, Continental Resources, et al. v. United States All right. Counsel, you may proceed. Good morning, Your Honors, and may it please the Court. Michelle Melton on behalf of the United States. I'd like to reserve four minutes for rebuttal. In order to carry out Congress's directive to create Garrison Dam in the early 1950s, the United States acquired title to those riparian uplands along the Missouri River that it did not already own. This process, excuse me, this process was completed around 1953, and the boundaries of U.S. title were clear in the core segment maps and the title transfer documents at that time. There was no dispute about title to those lands for 60 years, but now North Dakota is claiming that it, in fact, owns some of those lands, and it's doing so in a suit that is not pursuant to the Quiet Title Act, the exclusive means for adverse claimants to challenge U.S. title. There are two sets of issues in this case. The first is sovereign immunity, and the second is the merits. I'd like to start with sovereign immunity. Congress does not waive sovereign immunity to this suit. The only identified waiver is 28 U.S.C. 2410A. That statute waives sovereign immunity for interpleader actions and actions in the nature of interpleader, but only if the United States has or claims a lien. 24, excuse me, 28 U.S.C. 2410A does not cover this lawsuit for two independent reasons. First, the United States does not have or claim a lien under North Dakota law. Continental cites North Dakota Century Code, Section 353702, as conferring a lien. That provision does give interest owners, including royalty holders like the United States, a lien, but unlike other provisions of Chapter 35, does not specify when that lien arises. And because it does not define when the lien arises, the general provisions of North Dakota Century Code, Chapter 35-01 control, and under those provisions, a lien by operation of law arises when the obligation to pay arises. Of course, to the extent the Court disagrees that the general provisions control, Chapter 3537 does not suggest that a lien arises at severance. In fact, severance is actually not used in the substantive provisions of that statute. Roberts. Let me ask you this. Once the district court ordered the money be put in escrow, would the United States have had a lien over that, over those funds that had not yet been paid? Kagan. In our view, no, for two separate reasons, Your Honor. One, we elaborated on this in the footnote in our opening brief. There is no obligation to pay because the district court's order obviates the need for Continental to pay. So without a need to pay, under the general provisions, there is no lien. An alternative understanding of Chapter 3537 is that a lien is created only when the purported lien holder, in this case the United States, takes certain steps to give notice. Those steps were, nobody contends that those steps were taken here by the United States, and therefore there's no lien. I want to point out, I think it's very obvious when you look at the purposes and the legislative history that we cite in our reply. This is an oil and gas sales lien. It is not an oil and gas lien to protect royalty holders in the first instance. As legislative history makes clear, it is to protect oil and gas producers who sell that oil and gas to a third party from the bankruptcy of that third party. So it is in order to, now of course, sorry, let me back up. Those oil and gas producers can have a lien by contract, but this statute protects those oil and gas producers who do not have a lien by contract by giving them a essentially post facto lien by complying with certain notice provisions. But none of that's in the plain language of the statute. That's all from the legislative history, right? I think it's very clear under 35-3703, which says that no lien is effective until the steps in 35-3704 are taken. So I think under either sort of understanding, whether you understand 35-3702 as not discussing when a lien arises, or whether you understand 35-37 as creating a lien after these steps have been taken, in no situation does the United States actually have a lien here. I just wonder whether, suppose they had withheld payments. Suppose Continental had just withheld payment. To me, under the plain language of the statute, it appears that there's a lien. But maybe the United States argues that, well, that didn't occur in this case, at least until the district court ordered it, and that there's other reasons not to find a lien. Is there something wrong with my line of reasoning here? I think that if, excuse me, if Continental had failed to pay, they may have a lien under — you know, had failed to pay when the royalties were due. Under our interpretation of the statute, they might have a lien. That's not what happened here. Continental was current on its royalty payments. So you agree with me? In that situation, I think it is — in that situation, we are not in here. I think that it is possible that the United States would have a lien, again, assuming that those notice provisions were not required. I think that in that situation, it doesn't really matter, because the United States could still go after Continental to pursue, under U.S. statutes, to pursue the royalty obligation. And in that case, had Continental waited and not paid, and then waited for an enforcement action, we wouldn't have the sovereign immunity problems that we have here. What if they had interpleaded it, though, at that point? Suppose there had been no payment and they interpleaded the funds that they were supposed to pay the United States? Again, that didn't happen here. So I think we agree on that. But I'm just trying to figure out when it applies and when it doesn't. Well, in our view, in that case, if there was actually a lien, 2410A would still not waive immunity to this suit, because in our view, 2410A only waives immunity. And this is — it's not just our view. It's the view of every appellate court that has ever addressed this issue, only when the underlying suit is about the priority or procedural validity of liens. And no one here contends that this is such a suit. This is a suit about the validity of title. And it's being — it's being brought up as an interpleader, but it is incorporating an adverse claimant to U.S. title, and it's a title adjudication. And Congress has been very clear that title adjudications need to proceed under the Quiet Title Act, and the Court has so held. But — well, you represented that other cases had said that that's the only way. Is that accurate, or is it just that those cases, that was the factual scenario in those cases? So I want to tease apart. There's the Quiet Title Act cases, which say that the Quiet Title Act is an exclusive means to —  — for adverse claimants. But — And then there's the taxpayer cases. Yeah. And you said that it was only priority — And procedural validity. And procedural. And you said that the cases ruled that that was the only way. Are you saying that they are — those words were expressly said in those statutes, or is that just the factual scenario that occurred in all of the cases that you're citing? I think that is the holding. They don't — not all the cases express it that way. They're tax assessment. And each court that has addressed that circumstance has said that is not allowed because doing so would circumvent the carefully crafted procedural and substantive provisions in the tax code. And I would submit to you that the same situation is the one that we have here because the Quiet Title Act is a detailed statutory scheme that provides procedural and substantive requirements for adverse claimants who challenge U.S. titles. So, for instance, 28 U.S.C. 2409A subsection M requires states to provide 180 days' notice before filing a Quiet Title Act suit. That is not, in theory, required under 2410A, and it did not happen here. It's hard for me to reconcile that requirement with this case. Similarly, 2409A subsection A prohibits defendants from raising — excuse me — raising challenges to lands on which the United States claims and holds interest for Indians. Under Continental's logic, I don't see how under 2410A those lands would be carved out. And so I think that there's a tension, and honestly I would say it's more than just a tension between suits that could be brought under 2410A and suits that could be brought under the Quiet Title Act. There are other examples in the Quiet Title Act as well. So redemption provision that allows the United States to buy property if there's an adverse judgment in a Quiet Title suit rather than giving the property up to the defendant. It's not really clear how that works in the context of a 2410A suit like this one, where in theory it's just about the royalties, but in reality it's an adjudication of U.S. title. Counsel, under North Dakota oil and gas law, what interest does a royalty owner under an oil and gas lease have in oil when it's severed from the subsurface? I'm not sure that North Dakota law gives the United States any interest, any security interest. That's not my question. What interest does a royalty owner have in North Dakota under that state's oil and gas law to oil that's brought to the surface under an oil and gas lease? I believe that they have whatever the contract or lease that they're working under entitles them to. Perhaps I'm misunderstanding Your Honor's question. Well, does the royalty owner just give their interest away? No, but their — How do they get paid? Their interest is governed by the contract that they've entered into with the producer or by the lease. In our case, it would be governed by the lease, which is — And how is the royalty owner to get paid? Well, it would be governed by the provisions of the lease. In our case, the lease and the regulations, but the leases incorporate the regulations. Let me ask it this way. What protects a royalty owner from having its interest in the oil and gas that's brought to the surface, having that oil and gas, for example, stolen, or the producer just refuses to pay the royalty owner? What protections does the royalty owner have? I assume you're asking the question in general because regulations and the United States lease would protect the United States. For other lessees, they — Well, no. My point is, doesn't a royalty owner have a lien on its interest in the oil and gas that's brought to the surface? Not under 3537. To assure that it's going to get paid, it's one-eighth or three-sixteenths or whatever the interest might be under the lease? I don't think that Chapter 3537 gives them that interest. If it exists, it does not exist under that provision. And I will just point out the statutes that both Continental cites in their brief and the statutes that we cite in our brief from other States are actually very clear that they do give royalty holders that interest at or before severance. We cited in our reply the Oklahoma statute and the Texas statute. They are crystal clear about this. They say an interest owner has a lien at or before severance or at the time of severance. Mississippi has a statute that says it's 120 days after some things have happened. Those types — that clear evidence is just not present in Chapter 3537. One other point before I turn to the merits, if the Court will allow. Continental North Dakota claim that this is just about specific royalties pleaded and not actually a title dispute. That's true in a very hyper-technical, formalist sense in that the stake that is pleaded by Continental is just current royalties. It's not past royalties and it's certainly not future royalties for minerals that they have not yet produced. But in a broader sense, I think that that's very disingenuous. All the parties here understand that this suit, should the Court reach the merits, which we would discourage, will have a preclusive — or would potentially have a preclusive effect on future suits. And in fact, I would argue that North — I would expect that North Dakota would make such arguments in any future suit governing the Ordinary High Watermark, including potentially it's a Quiet Title Act suit that it has yet to bring, but has noticed. But wouldn't North Dakota would have to bring that, though, correct? Not — not Continental? That's correct, and they have noticed a suit, Your Honor. So we submitted a 20-H.A. about that. And does — does that — what — what does that do to our case? The Quiet Title Act suit? What — no, to this case. Oh, you know, I think it's evidence that — that there is more at stake here and — and that they would like to adjudicate — to resolve that or get an order resolving that. I would submit to you that they're going to argue in that suit if this — if this Court reaches the merits, that this case would have a preclusive effect on that future suit because there's mutuality of parties. The issue is the same, and it would be actually decided should this Court reach the merits. Will the United States argue in the Quiet Title suit that — that there's been no waiver of sovereign immunity? No, there would be a waiver of sovereign immunity if North Dakota would bring that suit. That's not this suit, right? We're not saying that nobody can ever dispute these issues. We're just saying that this is not the proper vehicle for that. I just don't want to — you know why I'm asking the question, because I just don't want — want to say, oh, yeah, this is not a lien, and then this is a Quiet Title Act, and then you get to No, this is not a Quiet Title Act, and this is a lien case. I certainly can understand Your Honor's concern, but it's — that's not what's going on here. We — we think that that would be a proper forum to adjudicate this dispute. Well, counsel, let me get back to my — my question. Let me be even more specific. Under the statute 3537.021, as I'm reading it, it says that there's continuing security interest in and a lien on the oil and gas severed or the proceeds of sale if the oil or gas has been sold to the extent of the interest owner's interest until the purchase price has been paid to the interest owner. To secure payment from the sale of oil and gas, the interest owner has a continuing security interest if the oil and gas has been sold. That's how I read that provision, and that's consistent with the chapter — the title of this chapter, which is oil and gas owners' sales liens. It does not — oil and gas owners' liens. To secure payment from the sale of oil or gas, an interest owner has a continuing security interest in and a lien on the oil and gas severed or the proceeds of sale if the oil or gas has been sold to the extent of the interest owner's interest. So why doesn't — when that oil was severed, why doesn't all of the royalty owners have a lien on that oil and gas at that — the moment of severance? I would — it does not say that they have an interest at severance. It says to secure payment from the sale of gas, they have a continuing security on the oil and gas severed to the extent of the interest until the purchase price has been paid. To me, that does not say at the time of severance. If the Court disagrees, though, we do have our fallback — not our fallback, our alternative argument, which is an independent argument about this suit being inconsistent with the Quiet Title Act and 2410A not waiving for that reason. I see that my time is up. I have not yet addressed the merits, but hopefully, if the Court gets there, we can talk about that on rebuttal. Other questions? All right. You may stand aside. Thank you. You may proceed. May it please the Court, Daniel Volchak for Continental Resources. Your Honors, I will address sovereign immunity. Mr. Axe will then focus on the merits. I want to get to why I think it's clear that the appellees are the ones who are relying on the plain statutory text here on both the State side and the Federal side. But I want to begin with what I think Judge Shepard was perhaps getting at with some of his questions to U.S. counsel, which is the enormous unfairness of the U.S.'s position here. First of all, it's unfair to Continental. Two different sovereigns are demanding the same money — millions of dollars — from Continental. There has to be a way for Continental to get a judicial resolution of that double liability, even if the entities making the competing demands aren't themselves interested in seeking a judicial resolution, which was true for many years. Yes, North Dakota has now noticed a quiet title suit. We're eight years after Continental brought this suit, and more than that, after these two entities began demanding the same money. So I think there's good reason why Congress would have wanted to waive sovereign immunity in this situation. And I think it's one of those happy cases where applying the plain statutory text aligns with common sense, good policy, fundamental fairness. Now, the unfairness of the U.S.'s position is not limited to Continental, as I think Judge Shepard was getting at. In this case, to avoid this action, the United States is asking this court to interpret state law in a way that would hurt North Dakotans by leaving every oil and gas lessor in the state with only an unsecured interest on its minerals until such time as a payment had not been made. Now, the U.S. may not care about its interest being unsecured. It has lots of ways to collect from people who owe it money. But for an individual North Dakota farmer, for example, who has minerals on his or her land and is leasing that land to make a little extra money to help make ends meet, the U.S.'s position creates an enormous risk of financial loss. I submit the plain text that I'm going to get to in just a second shows that the legislature did not intend to impose that financial vulnerability on individual North Dakotans and respectfully submit that a federal court should not do it because it serves the United States in a particular case. Now, plain language, 353702, Judge Shepard, I think what you were getting at, and I certainly agree with you if you were, the plain language says, has a lease on the oil and gas severed. That necessarily means that a lease arises at severance. Because if it didn't, if the U.S. were right that a lease could not arise until much later, then it wouldn't always be true that an interest owner has a lien on the oil or gas severed. It's extinguished. I mean, even if you read it that way, it's extinguished once the purchase price has been paid to the interest owner. And my understanding is that at the time of the suit, the United States was fully paid. That is so, Judge Strass. But the complaint alleged, and it has never been disputed, that every month new oil and gas was being severed and that there were some oil and gas for which the United States had not yet been paid. So the facts on the ground, as alleged, as accepted by the district court, and as not disputed, I understand it, by the United States, we were squarely within the plain language of 3537.02. But that would have been a future lien. That's not a lien. Because unless you can point to actual gas that has been severed where they have not been paid, I think you have a problem. That is what is alleged in the amended complaint. Again, I don't understand the United States to dispute this. At the time of the filing of the suit, there was oil or gas that had been severed, not yet sold, and the proceeds paid to the United States. If they dispute that, they can point to where they have done it in their brief or what the basis for it is. Did you just say where the proceeds had not been paid? Correct. The proceeds had not yet been paid to the United States. Now, counsel for the United States relied very heavily on that introductory clause of 3537.02 to secure payment of the proceeds. But you need a lien on the severed gas in order to be able to secure payment of the proceeds. Otherwise, for example, if a lessee goes bankrupt between the time of severance and the time of payment, suddenly under the U.S.'s position, the interest owner has only an unsecured lien, and you're not going to get paid. So you need the lien on the severed oil or gas in order And I'm not sure it's clear, and I just thought of this. Does the record clarify whether we're talking about oil or gas? Both, Your Honor. The allegations in the amended complaint, which the U.S. brought a facial motion to dismiss. We are up here on this part of the case on the grant of a facial motion to dismiss. There was no dispute, as I understand it, about the facts, and the allegations were oil and gas. And is Continental Resources a producer, or is it also a refiner and a distributor of gas? I am highly confident, but not 100 percent sure in Judge Shepard, that it is just a producer. So I do want to make sure I turn to Federal law. And the United States says this is what she described as their alternative argument, even if there is a lien under State law that applies only to the procedural validity of liens or the priority of liens. There is no textual basis whatsoever for those limitations, and the U.S. doesn't claim that there is. Is there any case law that expressly says that? No. So let me get to what they offer for their A, textual limitations. Okay, number one, legislative history. You can't use that. That's most recently the Supreme Court Kurtz case that we filed 28 J letters about with this Court back in February. Next, they point to these tax cases, which they say, which said you can't use 2410 to do an end run around the tax code. Here is the key point. The difference is the reason the United States' analogy doesn't work, the Quiet Title Act says in text that if you are properly within 2410, the Quiet Title Act doesn't apply. That's 28 U.S.C. §2409A, paragraph A. So 2409AA, the two statutes are mutually exclusive. And the United States agrees with that. And their only answer in 2410. That's 100% correct. It's just 100% nonresponsive to our argument. We are not saying the two statutes are mutually exclusive, so we win. We're saying the two statutes are mutually exclusive, so your end run argument fails. And it does. QTA says if you're within 2410, and that's the state law argument that I've been making and we've been having this morning. That's a separate question. But if you're in 2410, QTA says it doesn't apply. You cannot do an end run around the QTA using 2410. And the last thing they point to in support of their A textual limitations are cases in which the U.S. Supreme Court described the Quiet Title Act as the exclusive vehicle for an adverse claimant to challenge the U.S.'s title to real property. There is no adverse claimant in this case. They didn't dispute in their reply brief our argument that we are not an adverse claimant because we're not challenging their title to real property. They said instead North Dakota is an adverse claimant. But it isn't. We cite on page 4 and on page 25 of our brief the language from the Supreme Court's decision in Patchak making clear that an adverse claimant means a plaintiff. North Dakota is not a plaintiff here. It is a defendant. My last point — You know, I want to ask you this, because I think the premise of your argument is this can't — you know, there has to be a way for you to resolve this. I'm not even sure your premise is correct. Sovereign immunity is sovereign immunity. If the United States hasn't waived it — and you're going to argue that they did, and that's fine. But if the United States hasn't waived it, it's sort of too bad, too — so sad. I completely agree, Judge Strauss. My argument is based on the plain text. And my equitable arguments were why it would make perfect sense for Congress to want — to have wanted to waive immunity here. I agree with you. We do not win based purely on the equities. We win based on the plain text of both state law and federal law. I don't want to run into Mr. Axe's time. I'm happy to answer any other questions. Let me ask a question, and I'll extend your time for you to answer. In this case, we've got certain lands which everybody agrees are state-owned, and the minerals are — that state owns an interest in the minerals. We've got some land that everyone agrees are federally owned. But then we've got this dispute that's related to this ordinary high-water mark. Isn't that — isn't that the part of this that's in dispute and that money is being accumulated that has been interpled and that there needs to be a decision on? Yes, Judge Strauss. That is — excuse me, Judge Shepard, that is exactly what this case is about. We brought this interpleader to get a judicial resolution of the money that two sovereigns were both demanding, same amount. So while the royalty that the federal government has been clearly entitled to has been paid out, presumably monthly, and what the state is entitled to has been paid out, presumably monthly, you've got — you're accumulating money that's in dispute between the two — these two sovereigns. Correct. And the plain text of 247 says when you've got an interpleader action involving title — property in which the U.S. has or claims a lien — it doesn't even have to be a lien, as for claims a lien. Plain text language. They don't have a plain text argument. I ask the Court to affirm the finding of no sovereign immunity. All right. Thank you. All right. You may proceed. May it please the Court, Phil Lax for the State of North Dakota. We agree with Continental on jurisdiction, so I'd like to spend a few minutes addressing the merits, which unfortunately my counsel for the United States wasn't able to reach, so hopefully I'll be able to answer Your Honor's questions on the merits. How the Court decides the merits likely comes down to how they're framed. The State and the District Court understood this to be a choice of law dispute, resolvable on purely legal grounds. But much of the argument from the United States was an attempt to recolor the dispute and frame it more like the State was engaged in gamesmanship, or that it was being hostile to the interests of the United States. And we don't think that characterization is apt for what was going on here. So today I'd like to first briefly explain why the District Court was correct to resolve this as a choice of law dispute by applying State law. And then second, address why the Federal Government is getting it wrong by attempting to reframe this as gamesmanship or hostile action by the States. And the choice of law dispute is here is this. It's whose law, State or Federal, defines the ordinary high-water mark for an intrastate riverway when the Federal Government reacquires the property on the shoreline. And the Supreme Court's decisions in Corvallis and Wilson largely provide the answers. Corvallis would direct that State law applies in the first instance, and Wilson would provide the rule that even if Federal law applied in the first instance, it generally borrows State law for resolving intrastate property boundary disputes. And Corvallis applies here in three straightforward steps. First, it provides the rule that once the Federal Government relinquishes title to land, that land passes under the color of State law. Secondly, once land passes under the color of State law, any subsequent changes in the contour of that land, specifically referring to fluctuating riverbeds, are themselves defined by State law. And then third, and importantly for this case, when someone conveys an interest, they can only convey an interest that they own. So when the Federal Government reacquired property abutting the Missouri River down to the ordinary high-water mark, that high-water mark was necessarily defined by State law. And that's just a simple, straightforward, logical progression for how Corvallis says State law would apply in the first instance here. And that leads to the Federal Government's argument is, essentially their argument is, because this is happening retroactively, because this is happening 60, almost 70 years later, the State must be engaged in something that is adverse to the United States, therefore you shouldn't straightforwardly apply Corvallis. And their claim is because when the State commissioned a survey in 2017, its intent was to create a comprehensive survey for the entire reservoir, demarcating where State law placed the ordinary high-water mark. And it made that retroactive back to the reservoir's creation. The United States' contention is that by doing that, it's engaged in something hostile to the United States. And that it's changing ownership rights that had vested many years before. But the State Supreme Court has already rejected that reading of State law. This was Soremby State, 2020. In that State, private plaintiffs alleged that because the State had made that 2017 survey retroactive back to the reservoir's creation, and then refunded hundreds of millions of dollars based upon that, that the State was retroactively changing vested ownership interests. The State was not creating a comprehensive survey. The State wasn't changing ownership interests under State law. It was clarifying what they had been all along. No, there's a problem that's related to this that you're not covering, which is the Supreme Court cases talk about being neutral and generally applicable. This one is not. This one is where they're setting up the property ownership of the riverbed in a particular way. When you're talking about neutral and generally applicable, you're talking about this is how generally water rights are determined or oil royalties are determined, not we've got this survey and it says North Dakota wins. I mean, that is not neutral and generally applicable. Well, I would say, Your Honor, the neutral and generally applicable aspect of it was the statutory direction how to commission the survey. The survey itself was a result of a statute directing the Land Board to commission a survey applying State case law for how the And one other point I'd like to touch on. I'm not sure that fully answers it, though. I mean, the fact of the matter is the whole point of that legislation was in order to get North Dakota the rights to, at least in my view, the rights to this. And it set up a survey that sort of went with that goal in mind. I'm just not sure that that's what the Supreme Court had in mind. And in particular, the Supreme Court emphasized you win some, you lose some under State law. If you're applying, so sometimes the United States will win some and sometimes the United States will lose some. But if we allow this to go on, then perhaps the United States will lose all of them because every state will have an interest in maximizing its own oil royalties. Well, no, Your Honor. I think there's a couple of structural disincentives to suggesting that if states are able to define the ordinary high-water mark under law, that they would be unconstrained and able to maximize it for their own benefit. For one, of course, states are subject to their own citizens. There's a lot of plots along the river who are privately owned, who would not sit idly by if the state arbitrarily made the ordinary high-water mark 20 feet higher. Second, there's, of course, federal court jurisdiction. If the state were to engage in arbitrary behavior like that, the court in Wilson noted that federal court jurisdiction would be a relevant backstop against that. And third, I would also point to the U.S. brings up the point about their navigational servitude, whereby they have free, they have a no-expense easement up to the ordinary high-water mark. So I think that would be another disincentive for the state to engage in gamesmanship by just arbitrarily increasing its ordinary high-water mark because it would be giving the federal government an unpaid-for easement. So I think all those are structural reasons why the state wouldn't be, why it wouldn't be likely to engage in gamesmanship. I would also note, just as a factual matter here, while I think the net result is likely accrued to the benefit of the state, I think there are a few examples where the state's definition was actually lower than the federal government's  Now, one other point I'd like to briefly make. The federal government said in the reply brief that in the 1950s, the state's definition of the mark was the same as what they say the federal common law was. But even if that's true at a high level, I don't think there's anything to support it on the specifics. We noted in our brief one of the main differences between the federal definition and the state definition is the intensity of agricultural use that qualifies land to be below the mark. Both the state and the federal government agree that at a high level, once land loses its value for agricultural use, it's below the line. But that still leaves the question of when does it lose its value? Is intermittent livestock grazing enough? Is wetland grazing enough? That's the sort of thing that's resulting in the state and the federal government having slightly different lines in some locations. And there's nothing to suggest, at least nothing in the record, that suggests in the 1950s that the state's understanding was the same as the federal government's. And I would also note that when the survey was commissioned in 2017, it expressly directs that the survey should be commissioned in accordance with state case law, which suggests the state wasn't abruptly changing its methodology for how it was defining the high water mark. So I just have a few seconds, unless Your Honor has any questions. I think not. All right. We would urge the Court to affirm. Thank you. All right. Please come forward. And we asked quite a few questions. I will allow you a minute to conclude. Thank you, Your Honor. Well, and in particular, just to jump right in, the thing that's absolutely essential for you to answer is the argument that there was oil and gas that was extracted according to Continental's argument and that had not been paid up yet. Frankly, that's not knowledge that the United States has. We don't have information about what they're producing at exactly that moment. I don't want to answer a question that I don't know the answer to. I have no reason to believe that they are saying something that is not true, but I can't, from the United States' position, verify. Wasn't that alleged in their complaint? I believe it was, but I don't have any independent knowledge of that. The United States, like BLM doesn't know, Honor doesn't know what they're producing before they report it. But if we conclude, and this is maybe outcome determinative, if we conclude that's gone unrebutted and that the statute covers oil and gas itself that has been severed, then the United States probably loses the waiver of immunity, right? Well, in that situation, if Your Honors do not agree with our argument about North Dakota law, we would still have our argument under 2410A that that statute does not encompass this suit. I mean, I want to be very clear. Counsel on the other side has made a lot about plain text of this 2410A. The plain text of 2410A says this. The plain text of the General Allotment Act under Motau's is very clear and it did allow that suit, but the Supreme Court nonetheless said that suit is inconsistent with Acquired Title Act and it cannot be brought. So I don't think that the plain text, and I will also say in Falique as well, those taxpayers had liens. Those cases did fall within the plain text, Falique and its progeny, of 2410A, but the courts in those cases still did not allow those suits to proceed. So, you know, I don't think that that's – I don't think the plain text here resolves the matter. I think it's a much more complicated question than that. If I may just – I see my time has expired. If the Court would indulge me to respond on the merits very briefly. I think the States claim that it's not hostile to the United States is belied by the facts here. North Dakota at one point was claiming the entire of Lake Sakakawea, and that's obviously not what they're saying now, but they want this Court to bless a rule that would allow them to do that at any point in the future, and that is frankly hostile to the United States' interest, and they are asserting an ordinary high-water mark rule that would move the boundary in their favor pretty much unilaterally. So I think that their conduct speaks for itself. I will say also, this may or may not be clear to the Court, the border between the riparian riverbed in 1953 was extremely clear. I want to point this Court to the appendix at page 118, really 116 on. They're the core segment maps. You can see in those maps exactly where the boundary was in 1953. Those maps were used for the title transfer documents. You can see the original high-water mark as it was meandered back in the 1890s and through the – in the early 1900s. You can see exactly where the river has moved. You can see the exact amount of acreage that was attributed to both private landowners and the State at that time. What the State is trying to do is retroactively apply its law to take United States property. That is not permissible under our constitutional system. We ask the Court to reverse. Unless there are any questions? Thank you. I have five seconds to speak to Judge Strauss' question. Now, your time is used up. Thank you, Judge. And the case has been adequately argued, and thank you, counsel. The arguments have been very helpful, very interesting case. The case is submitted, and our panel will render a decision as quickly as we can. Does that conclude our calendar for this morning? Yes, it does, Your Honor. Very well. The Court will be in recess until next time.